In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 21-2660

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JALEN HOWARD,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00255-TWP-MJD — **Tanya Walton Pratt**, *Chief Judge*.

───────────────

ARGUED OCTOBER 26, 2022 — DECIDED MAY 10, 2023

───────────────

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted Jalen Howard of
being a felon in possession of a weapon, but he asserts that
the jury trial was tainted by errors that occurred during jury
selection when the district court injected the prosecutor's race
into the *Batson* inquiry and otherwise improperly evaluated
the peremptory strike against a Black juror. We find no error,
however, and therefore affirm.

**I.**

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986), *modified by Powers v. Ohio*, 499 U.S. 400 (1991). Race-based exclusions in jury selection harm not only the defendant, but also "public confidence in the fairness of our system of justice." *Id.* In *Batson*, the Supreme Court set forth a system for challenging peremptory challenges that sought to balance the traditional notion of allowing prosecutors to strike jurors for any reason, with the prohibition against striking jurors on the prohibited basis of race. *Id.* at 89; *United States v. Harris*, 197 F.3d 870, 873 (7th Cir. 1999).

Howard's *Batson* challenge in this case centers on the peremptory strike of Juror 24, a Black, female juror. During venire, the government struck the only three Black jurors on the 39-person venire panel. Howard does not challenge the strike of the first two jurors, but their removal from the jury pool left Juror 24 as the last remaining Black juror.[1] Howard challenged the strikes as discriminatory, and the district court moved through the three-step *Batson* analysis for evaluating the legitimacy of peremptory strikes challenged on the basis of racial discrimination. We describe that process in further detail below.

Juror 24 piqued the prosecutor's attention with her response to the district court's voir dire questioning about

---

[1] During jury selection, Howard initially challenged the strikes of all three Black jurors, but on appeal abandoned the challenge to Jurors 2 and 9.

internet usage. During the judge's explanation of a juror's duties and obligations, she admonished the jurors that they could not use the internet for any purpose related to or surrounding the case. Just before this admonishment she asked the jurors to "[r]aise your number if you don't use the internet." R. 152 at 17. Jurors 9, 13, and 24 each raised their numbers. Jurors 9 and 24 were two of the three Black jurors on the panel. Juror 24 told the court "I really don't use the internet. I usually leave that to my husband and the grandkids." R. 152 at 58. The prosecutor struck each of these three jurors because, he explained, "I do not believe people when they say they don't use the Internet." R. 127 at 30.

In response to the defendant's subsequent *Batson* challenge, the district court walked through the three-steps of the *Batson* inquiry. After articulating the third step—that the defendant meet its burden of demonstrating purposeful discrimination by the government—the district court summarized Howard's counsel's argument as follows: "Your sole justification and your persuasiveness is that the government attorney, who does happen to be African-American, has struck every single African-American on the panel." R. 127 at 26. In this appeal, Howard points to this comment and argues that the district court erred by injecting the prosecutor's race into the *Batson* inquiry. He also argues that the court erred by improperly evaluating the peremptory strike and failing to make required demeanor findings. We evaluate each of these in turn.

## II.

"When the government's choice of jurors is tainted with racial bias, that overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law

throughout the trial." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (hereinafter "*Miller-El II*") (cleaned up). Once a defendant challenges a strike, the trial court must use *Batson's* three-step process to evaluate whether the prosecutor has violated the Equal Protection Clause by removing potential jurors on the basis of race. *Batson*, 476 U.S. at 89, 93–98. First, the defendant must set forth a prima facie showing of purposeful race-based discrimination. *Id.* at 96. Once the defendant has successfully established a prima facie case that the strikes were race-based, the burden then shifts to the government to articulate a race-neutral justification for the strike. *Id.* at 97. Finally, in the third step (and the only one at issue in this case), the trial court must determine whether the defendant has carried the burden of showing purposeful discrimination—that is, that the government's race-neutral justification is not credible. *Id.* at 98; *see also Foster v. Chatman*, 578 U.S. 488, 499 (2016); *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (hereinafter "*Miller-El I*").

The third step of the *Batson* inquiry ordinarily "turns on factual determinations and, 'in the absence of exceptional circumstances,' we defer to [trial] court factual findings unless we conclude that they are clearly erroneous." *Foster*, 578 U.S. at 500 (*quoting Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). The trial court has both the jurors and lawyers before it, and therefore is best positioned to make the credibility determinations necessary in evaluating a *Batson* challenge. *Snyder*, 552 U.S. at 477; *United States v. Elizondo*, 21 F.4th 453, 466 (7th Cir. 2021). And because of the trial court's expertise in fact finding, particularly regarding evaluation of demeanor, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly

erroneous." *Miller-El I*, 537 U.S. at 340 (internal citation omitted).

Although we give factual determinations deference, any claims of legal error in the application of *Batson* are reviewed de novo. *United States v. Brown*, 809 F.3d 371, 373 (7th Cir. 2016). In this case, the defendant does indeed allege a legal error—that the district court considered the prosecutor's race in evaluating the government's exercise of a peremptory strike of a Black juror. Howard centers his claim on the court's statement, while discussing the persuasiveness of his *Batson* challenge, that the prosecutor "does happen to be African-American." R. 127 at 26. Howard is correct that it is indeed legal error "for a judge to assume that a prosecutor of the same race as a juror would not engage in discrimination against that juror simply because of their shared race." *United States v. Rutledge*, 648 F.3d 555, 562 (7th Cir. 2011).[2] As we

---

[2] In addition, Howard points out that the district court also erred by stating, at step one of the *Batson* inquiry, that "defense counsel has met his prima facie step one because his client is African-American." R. 127 at 34. Defense counsel immediately pointed out the error reminding the court that in "*Batson* [and] in the cases that follow, it's not about the defendant's race, but it's about the juror's race. … because it is the jurors who are essentially potentially being disenfranchised." R. 127 at 36. *See Powers*, 499 U.S. at 410, 416. The court agreed and immediately corrected the error. Howard mentions this in a footnote as "further indication that the court weighed irrelevant and improper factors in its *Batson* analysis." Howard Brief at 11, n.2. This is not a stand-alone claim for error (and could not be, as it was raised only in a footnote and arguments raised in footnotes are not preserved for review, *see Moriarty ex rel. Local Union No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005)). We consider it only for the limited purpose for which Howard raised it, which we assume was to add context to his primary claim that the court improperly considered the prosecutor's race.

noted in *Rutledge,* Supreme Court case law and our own have long "rejected any 'conclusive presumption' that a member of a group will not discriminate against other members of a group." *Id.* at 561 (*quoting Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998)). Although it would indeed be error for a judge to assume that a prosecutor of the same race as the stricken juror would not engage in race-based discrimination, there is no evidence on this record of this occurring. Instead, after making the aside about the prosecutor's race, the court went on to thoroughly evaluate the government's race-neutral reasons for striking all three jurors. This is in stark contrast to the facts in *Rutledge* where, after the prosecutor stated "for the record" that she too was African-American, the district court failed to make any factual findings about credibility that would have backed up the prosecutor's race-neutral proffer. *Id.* at 557, 560. The trial court in *Rutledge* simply declared that the government offered a non-race-based reason for the strike—the juror's demeanor—but never evaluated the credibility of that proffered reason. *Id.* at 560.

In contrast, in this case, the court put the government through its paces, properly setting forth the *Batson* steps, and then repeatedly pushing the government about its reasons for striking Juror 24. The court inquired three times if proclaimed internet use was the reason for the strike, and urged defense counsel to persuade her that the reasoning was pretextual. *See* R. 127 at 30–31. After overruling the *Batson* challenges for Jurors 2 and 9 from the bench, the court took the matter of Juror 24's strike under advisement and recessed to chambers to research *Batson* issues. After spending the recess reading the case law, she returned to the courtroom and made clear that she understood precisely what she must consider when evaluating step three of a *Batson* challenge: "[T]he third step is the

critical question [of the] persuasiveness of the prosecutor's justification for his peremptory strike, which comes down to whether the trial court finds the prosecutor's race-neutral reason to be credible." R. 127 at 35. The court then turned to assessing the credibility and persuasiveness of the prosecutor's reasons for striking Juror 24 as follows:

> The Supreme Court [and] the Seventh Circuit have repeatedly held that when a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist, who is permitted to serve, that is evidence tending to prove purposeful discrimination.
>
> If the government had left juror number 13 on the panel, the argument that he was not credible in making the strike might be persuasive, but the fact is that juror number 13, who was a white similarly situated prospective venire person was also struck.
>
> In this case, the Court finds that the government has provided a race-neutral reason for striking the remaining black juror, number 24, because he also provided that same reason for striking a similarly situated white juror number 13, as well as one of the reasons for number two, I believe.
>
> Additionally, there are no similar nonblack panelists who alleged to not use the Internet that are being allowed to serve as a juror during this trial. So, because he struck all of the persons

> who stated during venire that they did not use the Internet, and the government's indicated that he doubts the veracity of those statements, the Court, under the law, is going to find that the defense has failed to meet the criteria outlined in the third step of the *Batson* challenge.

R. 127 at 34–35. No part of the court's reasoning relied on the race of the prosecutor. Although it would have been better had the judge not mentioned the prosecutor's race, there is no evidence that this harmless error infected the court's reasoning in evaluating the *Batson* challenge. On the contrary, between the time the court made that statement and the time she issued her ruling, she researched the appropriate *Batson* justifications. When she returned after researching, she announced the proper legal basis for the court's evaluation of pretext. Where there is no evidence that an error influenced the outcome, and, in fact, evidence that it did not, we can set the error aside as harmless. *See, e.g.*, *United States v. Lockwood*, 840 F.3d 896, 901 & n.4 (7th Cir. 2016) (noting that a stray incorrect statement by the court did not affect the court's overall analysis and was at most harmless error).

With the legal error out of the way, we can look to the district court's assessment of the government's proffered reasons for striking Juror 24. Howard alleges that the court erred by improperly evaluating the peremptory strike and failing to make demeanor findings. Once again, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly erroneous." *Miller-El I*, 537 U.S. at 340 (internal citations omitted).

Although a trial court need not conduct an evidentiary hearing in all peremptory challenge situations, trial courts "should state fully their credibility determinations on the record so that such findings may receive the substantial deference to which they are entitled." *Morgan v. City of Chicago*, 822 F.3d 317, 328, 331 (7th Cir. 2016). When making credibility determinations, in some cases, the court must make an assessment of the demeanor of the prospective juror, for example, when the prosecution strikes a juror for appearing "agitated" or "frustrated." *Id.* at 329–30. In such a case, the court should make its own explicit findings on the record of its assessment of the juror's demeanor rather than relying solely on the government's contention. *Rutledge*, 648 F.3d at 560. Oftentimes, however, the juror's demeanor is not at issue, but rather the trial court is assessing whether the *prosecutor's* demeanor belies a discriminatory intent. *Morgan*, 822 F.3d at 330–32; *see also Hernandez v. New York*, 500 U.S. 352, 365 (1991) (stating that "the best evidence" of discriminatory intent "often will be the demeanor of the attorney who exercises the challenge").

Howard asserts that the district court failed to assess independently Juror 24's demeanor, but the cases that Howard cites in support of that argument are cases in which the demeanor of the juror was directly at issue. *See Snyder*, 552 U.S. at 479 (prosecutor's justification for strike was that juror appeared nervous); *Rutledge*, 648 F.3d at 560 (prosecutor's justification for strike was that juror "appeared agitated and also frustrated"); *United States v. McMath*, 559 F.3d 657, 665 (7th Cir. 2009) (prosecutor's justification for strike was that juror "looked angry and not happy to be here"). In this case, the demeanor of the juror was not at issue, only the credibility and reasonableness of the prosecutor's objective internet usage rule.

In this case, the prosecutor stated that he uses confessed internet usage as a proxy for truthfulness; he has a per se rule that he does not believe those who deny using the internet. Given the prosecutor's rationale, the court does not need to assess the credibility or demeanor of the juror. The prosecutor in this case might be incorrect in his theory that people who claim not to use the internet are lying. He also might be incorrect that these particular jurors were not telling the truth. The government's brief cites cases and research supporting the prosecutor's reasoning about internet usage—research that Howard argues instead supports his contention that people of Juror 24's demographic are the most likely to not use the internet. As an appellate court, we are not the fact-finders and arbiters of the adequacy of the research on who does or does not use the internet. The trial court's role during the third step of the *Batson* challenge was to determine whether the prosecutor's explanation was credible. And as the Supreme Court instructs, when assessing whether the prosecutor's race-neutral explanations are credible, the court can measure credibility "by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339. Our cases have oft said that "*Batson* and its progeny direct trial judges to assess the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006) (emphasis in original); *see also*, *e.g.*, *United States v. Hendrix*, 509 F.3d 362, 371 (7th Cir. 2007); *United States v. Cruse*, 805 F.3d 795, 808 (7th Cir. 2015); *Elizondo*, 21 F.4th at 466; *United States v. Lovies*, 16 F.4th 493, 500 (7th Cir. 2021). But of course, at the margins honesty and accuracy overlap. As the Supreme Court explained, at the third step, "the

persuasiveness of the justification becomes relevant … . At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The more inaccurate, or "silly or superstitious" the justification, the more likely it will be found to be a pretext. *Id.* at 768. The internet-usage-denying theory is not so implausible that no reasonable jurist could have found it credible.

In justifying his strike, the prosecutor explained that his rationale for excluding Juror 24 from the panel was that "My 102-year-old great grandmother uses the Internet. I do not believe people when they say they don't use the internet." R. 127 at 30. He pointed out that he also struck Juror 13 who he initially thought would be a good candidate for the jury. Juror 13 was a white male who was married, had four children, twelve grandchildren, and was a full-time pastor. We have noted that "[o]ne way for defendants to satisfy their burden at *Batson* step three is to identify a similarly situated, non-African American juror" who shares the same situation or characteristics with the stricken juror but whom the prosecutor did not strike. *United States v. Jones*, 56 F.4th 455, 479 (7th Cir. 2022) (*citing Miller-El II*, 545 U.S. at 241). A trial court can also measure credibility "by considering the offering party's consistency in applying its non-discriminatory justification." *United States v. Stephens*, 514 F.3d 703, 711 (7th Cir. 2008). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El II*, 545 U.S. at 241.

Howard argues that these cases only allow comparison between the *stricken* juror of one race and a similarly situated *non-stricken* juror of the opposite race—for example, if the prosecutor struck a Black internet-use-denying juror but allowed a white internet-use-denying juror to serve on the jury. Under Howard's theory a court cannot compare a *stricken* juror of one race to a similarly situated *stricken* juror of another race, as was the case here where the prosecutor struck both a Black internet-use-denying juror and a white internet-use-denying juror. Howard argues that this would allow prosecutors to evade *Batson's* discrimination-ferreting test by finding race-neutral commonality between Black jurors and white jurors and simply striking a similarly situated white juror each time it wished to strike a Black juror. We think this takes too narrow a view of assessments of credibility. Credibility assessments are holistic. Depending on the circumstances of the strike, credibility assessments can include things like juror demeanor, prosecutor's demeanor, patterns of strikes, disparate questioning during voir dire, comparative juror analysis, and consistency in applying non-discriminatory justifications. *See Morgan*, 822 F.3d at 329; *United States v. Corley*, 519 F.3d 716, 721 (7th Cir. 2008). It is true that the comparison between Juror 24 and Juror 13 is not dispositive of the prosecutor's credibility. Certainly, a court has more compelling evidence of a lack of credibility if a prosecutor says that he eliminates anyone who denies internet use and then strikes the Black juror who made such a claim but not the white juror. But even though the comparison in this case might supply less definitive evidence, it provides evidence nevertheless. We agree with Howard that these types of comparisons leave room for manipulation, but so do other factors courts consider in credibility assessments. And just as we trust trial courts to detect

incredible explanations with assessments of ethereal evidence like "demeanor," or to look for patterns in questioning and strikes, we must also trust the expertise of the trial court to look out for situations in which a prosecutor finds a trait that pairs each stricken Black juror with a similarly situated white juror as cover for race-based discrimination. We encourage trial courts to vigilantly look for these types of patterns.

In this case, the district court judge, after listening to the prosecutor's rationales for his strikes, found those explanations to be credible. It is true that much of her assessment centered on the consistency of the strikes between Juror 24 and Juror 13, but she assessed the sincerity of the prosecutor's beliefs in his professed internet abstention theory and found him to be credible. We cannot say that the prosecutor's theory was so "implausible or fantastic" so as to leave us with no choice but to conclude that the justification was "pretext[] for purposeful discrimination." *Miller-El I*, 537 U.S. at 339. We see no exceptional circumstances that would cause us to depart from our usual deference to the district court's factual findings and lead us to conclude that the court clearly erred. *See Foster*, 578 U.S. at 500. The decision of the district court is therefore AFFIRMED.